IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LESLIE DRINKWATER | : | |
| 1 Friarsheel Lane | : | |
| Malvern, PA 19355, | : | Civil Action No. |
| | : | |
|        Plaintiff, | : | |
| | : | Jury Trial Demanded |
|    v. | : | |
| | : | |
| AGRI-FEED MAN, INC. d/b/a | : | |
| PICKERING VALLEY FEED & FARM | : | |
| 305 Gordon Drive | : | |
| Exton, PA 19341, | : | |
| | : | |
| JAMES CRACAS | : | |
| 2110 7 Oaks Road | : | |
| Chester Springs, PA 19425, and | : | |
| | : | |
| WILLIAM CRACAS | : | |
| 1206 Conestoga Road | : | |
| Chester Springs, PA 19425, | : | |
| | : | |
|       Defendants. | : | |

## COMPLAINT

Plaintiff, Leslie Drinkwater, by and through her attorneys, hereby files this complaint against Defendants Agri-Feed Man, Inc. d/b/a Pickering Valley Feed & Farm ("PVFF"), James Cracas, and William Cracas, and in support thereof, avers as follows:

## I.   PRELIMINARY STATEMENT

1.   As set forth in greater detail herein, Ms. Drinkwater was subjected to unwanted sexual comments and innuendos, propositioned for sex for requesting a raise, fondled with objects sold by PVFF at its store, utterly humiliated when her supervisor simulated having sex with her from behind as she was bent over, sexually objectified in front of a customer, physically

touched and kissed against her wishes, subjected to comments regarding fanaticized sex between her and a minor, and physically assaulted in retaliation for complaining about sexual harassment.

2.      Ms. Drinkwater seeks declaratory, injunctive, and equitable relief; back pay, front pay, and lost benefits; compensatory damages; costs and attorneys' fees; and punitive damages against PVFF, James Cracas, and William Cracas for unlawful gender discrimination, hostile work environment sexual harassment, quid pro quo sexual harassment, retaliation, and battery in violation of federal and state laws.

## II.     JURISDICTION & VENUE

3.      This action arises under Title VII of the Civil Rights Act of 1991, 42 U.S.C. §2000e, *et seq*. ("Title VII"), the Pennsylvania Human Relations Act, 43 P.S. §955 ("PHRA"), and the tort of battery.

4.      Jurisdiction over the federal claim brought pursuant to Title VII is invoked pursuant to 28 U.S.C. §1343(a) and over the state law claims pursuant to the doctrine of pendant jurisdiction.

5.      Jurisdiction over the federal claim is appropriate because Ms. Drinkwater timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was cross-filed with the Pennsylvania Human Relations Commission ("PHRC"), regarding the unlawful discrimination and retaliation to which she was subjected while employed by PVFF.

6.      Ms. Drinkwater received a Right to Sue Letter dated October 4, 2021 from the EEOC.

7.      This action properly lies in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. §1391(b) because PVFF's primary place of

business is located in this judicial district, James Cracas and William Cracas reside in this judicial district, and/or the claims asserted herein arose within this judicial district.

**III.   PARTIES**

8.     Ms. Drinkwater is an adult individual who presently resides at 1 Friarsheel Lane, Malvern, Chester County, Pennsylvania.

9.     PVFF is a corporation with a principal place of business at 305 Gordon Dr., Exton, Chester County, Pennsylvania.  PVFF employs more than fifteen (15) employees and provides retail services affecting interstate commerce.

10.     James Cracas is an adult individual who, upon information and belief, resides at 2110 7 Oaks Road, Chester Springs, Chester County, Pennsylvania.  At all times relevant hereto, James Cracas was an owner of PVFF and the direct supervisor of Ms. Drinkwater.

11.     William Cracas is an adult individual who, upon information and belief, resides at 1206 Conestoga Road, Chester Springs, Chester County, Pennsylvania.  At all times relevant hereto, William Cracas was an owner of PVFF.

**IV.   FACTS**

12.     Ms. Drinkwater commenced employment with PVFF in April 2017.

13.     PVFF is a retail business that sells a variety of animals, animal food and supplies, plants, and garden supplies.

14.     Ms. Drinkwater was subjected to sexual harassment from her supervisor and company owner, James Cracas, after she commenced employment with PVFF.

15.     James Cracas would make sexual innuendos regarding the manner in which Ms. Drinkwater performed her duties, such as handling a hose to water plants, and would attempt to initiate conversations with Ms. Drinkwater to discuss the sexual proclivities of other female staff.

16.     By way of example, James Cracas would make comments to Ms. Drinkwater to the effect of whether she thought a certain lesbian employee "Preferred to be on the top or bottom," "Had frequent sex with her partner," and "Do you think she is still having sex? I know lesbians stop having sex after they are together for a bit and she has gotten fat recently, so I bet they aren't even having sex."

17.     With regard to a female employee who James Cracas deemed to be overweight, he would make comments to Ms. Drinkwater to the effect of "You know what's gross? That her husband wants to rail her," "How do think her husband can find it under all that fat?" "It must be nasty to have sex with her," and "She was attractive when I hired her but now, she's sloppy and fat."

18.     Each time, Ms. Drinkwater would walk away in an attempt to remove herself from the situation or to otherwise engage in discussion concerning store-related business to deflect any further, unwanted sexually based comments regarding PVFF's female staff.

19.     In 2018, Ms. Drinkwater left PVFF to take a job at Terrain, a retail business that sells garden and home supplies.

20.     At the time Ms. Drinkwater left PVFF, she was making approximately $15 per hour, while the job at Terrain offered her an annual salary of approximately $50,000.

21.     Within months after Ms. Drinkwater left PVFF, James Cracas approached her and requested that she return to work at PVFF.

22.     To lure Ms. Drinkwater back, PVFF offered to match her salary, provide performance-based bonuses, allow unlimited unpaid vacation, pay her commissions based upon online sales, and pay for all of her medical benefits.

23.     Ms. Drinkwater had reservations about returning to PVFF given James Cracas'
prior conduct but was agreeable based on his representations that PVFF was seeking to add a
new location, which she would manage.

24.     Upon PVFF's expansion, Ms. Drinkwater would be at a separate location and
have less interaction with James Cracas.

25.     Ms. Drinkwater returned in May 2019 to work for PVFF.  PVFF, however, did
not add a new location as previously represented.

26.     Within months James Cracas began subjecting Ms. Drinkwater to gender
discrimination and sexual harassment again, however, with much more pervasiveness and
severity than before.  The gender discrimination and sexual harassment to which Ms. Drinkwater
was subjected continued until her termination of employment.

27.     By way of example, when Ms. Drinkwater was handling sacks of PVFF product,
James Cracas would make comments, in reference to her breasts, to the effect that "Those look
heavy, would you like me to carry them for you," and that Ms. Drinkwater "Had a large rack."

28.     Regarding the physical appearance of other female staff members, James Cracas
would also make similar-type comments to Ms. Drinkwater, such as "You have the perfect
amount of ass and boobs, but she is all rack and no ass, and you have to balance both," and "Her
ass is great, but her boobs haven't been the same since she had a kid."

29.     When Ms. Drinkwater would handle certain dog toys, which James Cracas
ostensibly likened to an erect penis, he made comments to the effect "Can you deep throat that?"
"How far down before you gag?" "Do you think you can take all of this?" and other similar
comments suggesting that Ms. Drinkwater perform simulated oral sex on the toy.

30.     Still referencing the dog toys, James Cracas would make comments to Ms. Drinkwater to the effect "Do you think this one would be better up the butt?" "Do you think this looks like the dildo she uses on her girlfriend?" and "Look, this is ribbed for your pleasure."

31.     When Ms. Drinkwater would handle products made of wood, James Cracas would make comments to the effect "You like touching wood, don't you?" "You look really good with wood in your hands," and "Is that wood hard enough? I know some wood that might get harder."

32.     As before, when Ms. Drinkwater was watering plants sold by PVFF, James Cracas would approach Ms. Drinkwater and make comments to the effect of "Look at how wet you are handling that hose, I know another hose that would make you wet," "I love the way you handle that big hose," and "Look at how dirty you are playing with big black hoses."

33.     James Cracas' actions were unwelcomed, and in each instance, Ms. Drinkwater would either ask James Cracas to stop, try to change the conversation, or simply walk away to remove herself from James Cracas' presence.

34.     On occasion, Ms. Drinkwater approached James Cracas and asked that PVFF give raises to the staff.

35.     In response to one such request, James Cracas pushed the chair in which he was sitting backwards, patting his upper thigh/ groin area, and said "I'll give you a raise if you give me a raise."

36.     James Cracas' comment was an offer to provide Ms. Drinkwater with an employment benefit in the form of a raise if she performed a sexual favor for him in return.  Ms. Drinkwater turned and walked away in disgust.

37.     James Cracas would make similar type comments to the effect "I'll give you a raise if you give me a raise," and that he too "Needed a raise" whenever Ms. Drinkwater broached the subject of staff raises.

38.     Ms. Drinkwater does not currently have any children; however, she and her husband have been attempting to conceive, a fact to which James Cracas was aware.

39.     Knowing that Ms. Drinkwater and her husband were having difficulty conceiving, James Cracas would make comments to Ms. Drinkwater to the effect of "You know I could get you pregnant real fast," "Are you sure you know what hole to put it in?" "You know, you don't get pregnant from annal," and "You know if Nik can't do the job, I have already proven myself twice," in reference to his two children.

40.     The aforementioned examples of the verbal comments, jokes, solicitations, and innuendos were pervasive, severe and unwanted.

41.     The hostile work environment created by James Cracas, however, also included him inappropriately touching Ms. Drinkwater.

42.     James Cracas took phallic-shaped dog toys and poked Ms. Drinkwater in her breasts or on her backside with the item when he passed her in a store isle.

43.     On the first occasion, Ms. Drinkwater quite clearly told James Cracas not to touch her.

44.     Despite an initial apology and assurance from James Cracas that it would not occur again, he did in fact use a dog toy to inappropriately touch Ms. Drinkwater, presumably for self-sexual gratification.

45.     James Cracas' harassment did not end with him touching Ms. Drinkwater's breasts and backside vis-à-vis a dog toy.

46.     James Cracas took opportunities to degrade and sexually objectify Ms. Drinkwater in front of PVFF's customers and/or vendors.

47.     On one occasion while Ms. Drinkwater was bending over removing an item from PVFF's freezer, James Cracas stood back and stared at Ms. Drinkwater's backside.

48.     After Ms. Drinkwater stood up, James Cracas made a comment to a customer to the effect "If you think she looks good now, you should have seen her bending under the freezer," while at the same time putting his arm around Ms. Drinkwater's shoulders to pull her next to him so that the customer could look at Ms. Drinkwater.

49.     Such actions mirrored statements that James Cracas made to Ms. Drinkwater to the effect that "I only hire beautiful women because no one wants to buy anything from a fat slob."

50.     On one day, Ms. Drinkwater was assisting a fellow female employee with computer problems.

51.     In doing so, Ms. Drinkwater was bending over to plug in wires when James Cracas approached her from behind and simulated having sex with her.

52.     In total shock, Ms. Drinkwater immediately turned around and ran to the bathroom crying.

53.     On the same day, Ms. Drinkwater left PVFF feeling sick to her stomach after being utterly humiliated in the office.  She did not return to work for nearly two weeks.

54.     When Ms. Drinkwater returned, she again told James Cracas that she wants to do her job without being sexually harassed, stating "I want to come to work to work, that's it."

55.     Ms. Drinkwater told James Cracas that she needed to work and did not want him to touch her ever again, otherwise she would quit.

56.     James Cracas was aware that Ms. Drinkwater needed to work and continue receiving her salary because she and her husband had incurred significant housing expenses immediately before the COVID-19 pandemic and her husband did not have gainful employment after the outset of the pandemic.

57.     Given the uncertainties of available, well-paying employment positions during the pandemic, coupled with Ms. Drinkwater being considered an essential worker by the government, she needed to continue working in order to support her family.

58.     In response to Ms. Drinkwater's demand that she be permitted to work without being touched or otherwise sexually harassed, James Cracas told Ms. Drinkwater to go into the hallway with him.

59.     When Ms. Drinkwater responded that she did not feel comfortable being in the hallway alone with him, James Cracas yelled at her and told her to "Get into the hallway!"

60.     After entering the hallway, James Cracas apologized and said, "I crossed the line," in reference to simulating sex with her from behind without her knowledge or consent.

61.     James Cracas also told Ms. Drinkwater that she should not have told him to stop touching and harassing her in front of others, saying "I can't afford a divorce."

62.     James Cracas again promised to stop subjecting Ms. Drinkwater to sexual harassment.

63.     Despite James Cracas' assurances to cease sexually harassing Ms. Drinkwater, he failed to abate his offending conduct for long.

64.     On one occasion, Ms. Drinkwater approached James Cracas to discuss a newly hired employee who impressed her through her performance, intelligence and strong work ethic. The employee was a seventeen (17) year-old girl.

65.     During the conversation, Ms. Drinkwater told James Cracas that "She loved her and wanted to hire more kids like her" to work at PVFF.

66.     In response, James Cracas made comments to the effect "How much do you love her?" and "I would love to see the two of you together."

67.     Ms. Drinkwater became enraged and said "No Jim. No!"

68.     Ms. Drinkwater was angry not merely because of James Cracas' continued sexual harassment, but because his conveyed sexual fantasies to Ms. Drinkwater now involved a minor.

69.     James Cracas also reverted to inappropriately touching Ms. Drinkwater without her consent.

70.     On August 18, 2021, Ms. Drinkwater arrived at work in preparation for a meeting with a consultant for whom she had great respect and admiration.

71.     Soon after Ms. Drinkwater entered PVFF's facilities, James Cracas approached her, aggressively grabbed both sides of her neck and face, forced her head down, and kissed her on the forehead.

72.     Ms. Drinkwater immediately ran away from James Cracas and began crying.

73.     Ms. Drinkwater went to a back room in PVFF's facility where she was consoled by a fellow employee.

74.     Despite clearly evidencing that she wanted to remove herself from James Cracas' presence, James Cracas followed Ms. Drinkwater to the back room.

75.     When James Cracas saw Ms. Drinkwater, he said "I'm sorry.  I didn't mean to Cuomo you," in reference to ex-Governor of New York Andrew Cuomo.

76.     James Cracas then went into a rant about how ex-Governor Cuomo did not do anything wrong, that his actions were misunderstood, and that the entire ordeal was merely political in nature.

77.     James Cracas abruptly left, at which time Ms. Drinkwater broke into tears because of the grave emotional distress caused by James Cracas' continued sexual harassment.

78.     After being grabbed and kissed by James Cracas, Ms. Drinkwater tried to pull herself together for the meeting with PVFF's consultant, which was to occur within approximately twenty minutes.

79.     William Cracas was also at PVFF's facility for the meeting.  William Cracas is James Cracas' father and also an owner of PVFF.

80.     In general, Ms. Drinkwater had a good relationship with William Cracas; however, she was concerned that he had been getting frustrated with her because she was complaining more vocally for James Cracas to stop sexually harassing her.

81.     William Cracas was present when Ms. Drinkwater told James Cracas to stop touching her after he forcibly kissed her, was outside of the room when James Cracas "apologized" to Ms. Drinkwater, and Ms. Drinkwater walked directly past him while crying on the way to the restroom to make herself more presentable for the meeting.

82.     While in the bathroom, Ms. Drinkwater washed her head twice and even wiped the area where James Cracas kissed her with a Clorox wipe.  She also reapplied her make-up in an effort to conceal that she had been crying just minutes earlier.

83.     Ms. Drinkwater entered the meeting room and sat down at a table with James Cracas, his son, and PVFF's consultant.  William Cracas had not yet entered the room.

84.     In preparation for the start of the meeting, Ms. Drinkwater began looking for blueprint drawings of a previous store design.

85.     When Ms. Drinkwater asked if anyone had seen them, William Cracas entered the room from behind Ms. Drinkwater, and while saying "Here's your blueprint," he intentionally slammed the tightly compressed, folded stack of the blueprints down with great force directly on the top of Ms. Drinkwater's head.

86.     William Cracas had never struck Ms. Drinkwater previously.

87.     William Cracas intentionally and purposefully struck Ms. Drinkwater in retaliation for her complaining about being sexually harassed by James Cracas, the most recent of which occurred less than an hour early on the same day.

88.     The fact that William Cracas, an owner of PVFF, subjected Ms. Drinkwater to retaliation in the form of physical harm is egregious and evidences a wanton disregard for the health and safety of Ms. Drinkwater.

89.     Throughout the meeting, Ms. Drinkwater was in severe pain and had difficulty concentrating.

90.     Ms. Drinkwater began to more fully experience the severity of her injury after the meeting ended when she began having difficulty lifting objects as little as ten pounds and working on menial tasks.

91.     Ms. Drinkwater went to the Emergency Room after her shift and was diagnosed with a concussion and neck injury showing straightening of the neck.

92.     Since such time, Ms. Drinkwater has been engaged in concussion and physical therapy, which requires multiple sessions per week in an attempt to alleviate or otherwise lessen the effects of the aforementioned actions that occurred on August 18, 2021.

93.     Unfortunately, Ms. Drinkwater continues to have difficulty concentrating, suffers from vertigo, has limited ability of movement, is unable to balance herself, has diminished sensation on portions of her body, has difficulty seeing or otherwise focusing on objects, and has experienced other physical ailments typical of the concussion and neck injury she experienced resulting from the aforementioned actions on August 18, 2021.

94.     Ms. Drinkwater remains unable to work and Defendants' actions constitute a constructive termination of employment from PVFF.

95.     As a direct and proximate result of Defendants' aforementioned unlawful actions, including those that occurred prior to August 18, 2021, Ms. Drinkwater has suffered, and continues to suffer, loss of wages and benefits, loss of future wages and benefits, significant emotional distress, anxiety, anguish, and loss of life's pleasures.

96.     The pervasive and severe hostile work environment, quid pro quo sexual harassment, gender discrimination, and retaliation is particularly outrageous and egregious, thereby justifying an award of punitive damages against Defendants for the palpable disregard of Ms. Drinkwater's well-being and what she has been forced to endure while employed at PVFF.

97.     During Ms. Drinkwater's employment, PVFF did not have policies precluding sexual harassment in the workplace and there was no Human Resources Manager or any other individual designated to receive complaints of harassment.

98.     James Cracas often "bragged" to Ms. Drinkwater and other employees that he considered Ms. Drinkwater the Human Resources Manager and made comments to the effect "She would have only herself to complain about me," and "She can't complain to anyone else when I harass her."

## V.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Plaintiff v. PVFF
### Violation of Title VII, 42 U.S.C. §2000, *et seq*

99.     Ms. Drinkwater incorporates by reference the averments set forth in Paragraphs 1 through 98 as if set forth at length herein.

100.    PVFF unlawfully discriminated against Ms. Drinkwater on the basis of her gender/sex in the terms and conditions of her employment, allowed a hostile work environment to persist that fostered severe and pervasive sexual harassment, subjected her to quid pro quo sexual harassment, and retaliated against her for complaining about sexual discrimination and harassment, all of which are in violation of Title VII.

101.    As a direct and proximate result of PVFF's violation of Title VII, Ms. Drinkwater has suffered, and continues to suffer, great harm in the form of, past and future pecuniary losses, emotional pain and suffering, loss of enjoyment of life, and other damages recoverable under Title VII.

### SECOND CAUSE OF ACTION
### Plaintiff v. PVFF
### Violation of the PHRA, 43 P.S. §955

102.    Ms. Drinkwater incorporates by reference the averments contained in Paragraphs 1 through 101, as if set forth fully herein.

103.    PVFF unlawfully discriminated against Ms. Drinkwater on the basis of her gender/sex in the terms and conditions of her employment, allowed a hostile work environment to persist that fostered severe and pervasive sexual harassment, subjected her to quid pro quo sexual harassment, and retaliated against her for complaining about sexual discrimination and harassment, all of which are in violation of the PHRA.

104.     As a direct and proximate result of PVFF's violation of the PHRA, Ms.
Drinkwater has suffered, and continues to suffer, great harm in the form of, past and future
pecuniary losses, emotional pain and suffering, loss of enjoyment of life, and other damages
recoverable under the PHRA.

### THIRD CAUSE OF ACTION
### Plaintiff v. James Cracas and William Cracas
### Violation of the PHRA, 43 P.S. §955

105.     Ms. Drinkwater incorporates by reference the averments contained in Paragraphs
1 through 104, as if set forth fully herein.

106.     At all relevant times hereto, James Cracas and William Cracas were the owners of
PVFF.

107.     At all relevant times hereto, James Cracas was Ms. Drinkwater's direct
supervisor.

108.     James Cracas and William Cracas engaged in an unlawful discriminatory practice
in violation of Section 955(e) of the PHRA by aiding, abetting, inciting, compelling and/or
coercing the aforementioned discrimination, sexual harassment, and retaliation to which Ms.
Drinkwater was subjected.

109.     As a direct and proximate result of James Cracas' and William Cracas' "aider and
abettor liability" in violation of Section 955(e) of the PHRA, Ms. Drinkwater has suffered, and
continues to suffer, great harm in the form of, past and future pecuniary losses, emotional pain
and suffering, loss of enjoyment of life, and other damages recoverable under the PHRA.

## FOURTH CAUSE OF ACTION
### Plaintiff v. William Cracas
### Battery

110.    Ms. Drinkwater incorporates by reference the averments contained in Paragraphs 1 through 109, as if set forth fully herein.

111.    William Cracas committed battery when he, without Ms. Drinkwater's consent, made harmful and/or offensive contact with Ms. Drinkwater by intentionally slamming the tightly compressed, folded stack of the blueprints down with great force directly on top of her head, thereby causing her to suffer a neck injury and concussion.

112.    As a direct and proximate result of the battery committed by William Cracas, Ms. Drinkwater has suffered, and continues to suffer, great harm in the form of, past and future pecuniary losses, emotional pain and suffering, loss of enjoyment of life, and other damages recoverable under the Pennsylvania tort of battery.

## VI.    JURY DEMAND

113.    Ms. Drinkwater demands trial by jury on all claims and issues triable by a jury.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Ms. Drinkwater respectfully requests that this Honorable Court:

(a)    declare Defendants' conduct to be in violation of Ms. Drinkwater's rights;

(b)    enjoin Defendants from engaging in such unlawful conduct in the future;

(c)    award Ms. Drinkwater relief of back pay, front pay, and lost benefits;

(d)    award Ms. Drinkwater damages to which she is entitled for past and future pecuniary losses, emotional pain and suffering, inconvenience, loss of enjoyment of life, and any other compensatory damages;

(e)    award Ms. Drinkwater punitive damages to which she proves entitled;

(f)     award Ms. Drinkwater her attorneys' fees and costs incurred; and

(g)     grant such other relief as it may deem just and proper.

Respectfully submitted,

UNRUH, TURNER, BURKE & FREES

Dated: November 17, 2021          By: ___*s/ Brian D. Boreman*___

Brian D. Boreman
Attorney I.D. No. 84074
Bboreman@utbf.com
17 W. Gay Street
West Chester, PA 19382
610-692-1371
Attorneys for Plaintiff